THE WYOMISSING.

(District Court, E. D. New York. June 15, 1915.)

COLLISION ⊚⇒61—TOW AND DREDGE—FAULT.

    A dredge with a material scow alongside was engaged in working in the Kills between Staten Island and New Jersey, on the New Jersey side of the channel, under a government contract which provided that "in case the contractor's plant so obstructs the channel as to impede the passage of vessels it shall promptly be so moved as to afford a practicable passage on the approach of any vessel." A tug approaching with a tow of 25 barges to pass between the dredge and the New Jersey shore gave an alarm signal, but proceeded with the ebb tide, and 2 or 3 of the barges came into collision with the material scow and were injured. *Held,* that the alarm signal was not sufficient notice to place the fault upon the dredge for not immediately moving, but that the tug was in fault for not requesting the removal and stopping to give time for the same, if in the opinion of her master there was not sufficient room for a safe passage, and that in going ahead as she did she took the risk of collision.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. ⊚⇒61.]

In Admiralty. Suit for collision by James Morrow and another against the steam tug Wyomissing and the Morris & Cumings Dredging Company. Decree against the tug, and dismissed as to the Dredging Company.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for libelants.

Armstrong & Brown, of New York City (Pierre M. Brown, of New York City), for claimant of the Wyomissing.

Everett, Clarke & Benedict, of New York City (A. Leo Everett, of New York City, of counsel), for dredging company.

CHATFIELD, District Judge. On the 14th day of March, 1914, a tow of 25 coal scows, arranged 4 in a tier on a 25-fathom towing hawser, proceeding toward Elizabethport with an ebb tide, came into collision with a material scow which was moored upon the New Jersey side of the Morris & Cumings dredge, then operating in the Kill just north of the Elizabethport bridge, between Staten Island and New Jersey. The accident occurred in the evening, and all of the boats were showing the proper lights. The tug Wyomissing was in charge of the tow. The port barge in the third tier came in contact with the side of the material scow, and was shoved over or carried out of line, so that the bow of the libelants' scow, which was the port boat in the fourth tier, struck the corner of the material scow, slid up over the corner, and received injuries in so doing. The port scow in the tier immediately behind this boat also struck the corner of the material scow.

There is no dispute as to the size or shape of the tow. It was made up with the boats ready for towing and as to which orders had been received, with 4 boats abreast in a tier, because that was the custom-

ary way of making up a tow, and because up to this time the necessity for narrowing the tiers of boats either had not become evident or had not been accepted by the tugboats. The dredging operations were being conducted with the authority of the law. The contract provides (section 26) as follows:

"The contractor will be required to conduct the work in such a manner as to obstruct navigation as little as possible, and at the completion of the work shall remove his plant, including ranges and buoys, piles, etc., placed by him under the contract in navigable waters. In case the contractor's plant so obstructs the channel as to impede the passage of vessels, it shall promptly be so moved as to afford a practicable passage on the approach of any vessel."

The tugboat with the 6 tiers of scows took its position in making the turn just above the Crescent Shipyard so as to clear whatever boats were lying along the Central Railroad of New Jersey bulkhead. The testimony of the captain of the Wyomissing and of the captain of the Penquoit makes it plain that the tow passed as close to the Jersey shore as was safe, and that the stern of the tow either touched the shore or was held off by the Penquoit. These conditions fixed the position of the Wyomissing as she rounded the turn. Whether the dredge and the scow were further down toward the west, or whether they were up opposite the Crescent Shipyard, as fixed by the captain of the Wyomissing, makes substantially no difference, because the captain of the Wyomissing took a course apparently as far towards New Jersey as possible so as to clear the boats upon making the turn, and at that time estimated, and immediately indicated by blowing a signal, that he would have difficulty in navigating his tow under the ebb tide past the dredge and scow on the Jersey side of the channel.

The injured boat, which was in the fourth tier and on the port side, rode over the corner of the scow, which was low, because laden down on that corner. The barge immediately ahead struck the scow, but did not ride over the corner, and the barge immediately behind the one injured also struck the corner and received some injury itself. This would indicate that the tow had not yet rounded the corner and reached a position where the tow would be moving parallel to the scow. If the situation were such as the witnesses for the dredging company understand it to be, the accident could not have happened unless the captain of the Wyomissing deliberately went as close as possible to the scow, with the idea of forcing the captain of the dredge to move the scow, or to hug the scow, instead of the shore. If the captain of the Wyomissing did that, it was his fault. On the other hand, if we take the facts the way the captain of the Wyomissing fixes as the locality of the accident, then he was taking care of his boats in making the turn, and the boats were still under the influence of that turn at the time of the accident.

That would bring up the exact question presented by the provision in the contract, viz., as to whether the dredge was bound to move upon receiving a signal from a tow that it needed more room to get through the channel. It may be assumed that if the tow came to anchor, or sent a polite request in advance, so that opportunity was given to remove the obstruction, it would not be a strained construction of the

contract to interpret the words "any vessel" as a tow, and if movement of the scow was necessary to give a "practicable passage" for any tow, then upon notice the dredge and scow would have to be moved; but the requirements of navigation on signal by whistle cannot be the same as upon a polite request transmitted half an hour in advance.

So the question we have to deal with is what can be done in the way of indicating navigation or the movement of an obstructing scow by the blowing of an "alarm" whistle, when the boat thus giving a warning goes on, instead of stopping or avoiding danger. The requirement of the contract is that if "the contractor's plant obstructs the channel so as to impede the passage of vessels, it shall promptly be so moved as to afford a practicable passage on the approach of any vessel." That means, if a channel is not afforded, or if the channel is obstructed so that a vessel cannot get through, the channel must be cleared upon receiving notice. That does *not* mean that a vessel can take the risk of indicating that the channel is impeded, or that the passage left is not practicable, by suddenly blowing a whistle, unless it ascertains that that whistle is answered and knows that it can make the passage.

If a vessel moving down the channel with the ebb tide can rely upon giving a danger signal to indicate navigation, and thereby to indicate that it wishes a practicable passage for an indefinite sized tow, without any establishment of rules by which the size of the "practicable passage" would be indicated, then the vessel attempting to go through the space must stop and indicate its needs, or take the risk of the navigation. So, on the facts shown by the Wyomissing, I think that on this particular voyage the captain of the Wyomissing was depending upon the danger signal to make safe for him what might otherwise be dangerous, but that he had not by law, nor by custom, nor by rule, nor by agreement, any right to rely upon the captain of the dredge replying immediately to that danger signal and getting out of the way in time to make the passage safe. All the Wyomissing could expect from the danger signal was to suggest that if the dredge heard the signal and if it could promptly be moved so as to afford a practicable passage, that the contract required it to do so. Such a right is not the same as a whistle signal in navigation. I fail to see why under such circumstances the responsibility is not on the tug.

I think that under the contract the dredge had the right to temporarily take up the entire channel, *if necessary,* and that the navigating vessel had nothing but a right to insist on some safe method of having the dredge moved, so that they could take their boats through. The dredge was not an unlawful impediment, unless it failed to move so as to afford a practicable passage upon sufficient notice, which ought to be arranged in advance, to be given either by whisle or some other form of notice.

The libelants may have a decree, with costs.

The petition against the dredging company is dismissed.